# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00280-CV

---

**Affirmation Holdings, LLC, Appellant**

**v.**

**Windsor at Barton Creek, LP; CWS Apartment Homes, LLC;
CWS Capital Partners, LLC; Matt Pohl; and Forrest Bass, Appellees**

---

**FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-17-005501, THE HONORABLE JAN SOIFER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Affirmation Holdings, LLC appeals the trial court's final judgment in Affirmation's suit arising out of its purchase of an apartment-complex property. The court granted a summary judgment that Affirmation take nothing on all its claims against Windsor at Barton Creek, LP; CWS Apartment Homes, LLC; and CWS Capital Partners, LLC (collectively, the Windsor Parties[1]) and awarded Windsor alone attorneys' fees, expenses, and costs. Affirmation had pleaded breach of contract against Windsor and claims of common-law fraud, statutory fraud, and negligent misrepresentation against each of the three Windsor Parties.[2] Affirmation raises

---

[1] The Windsor Parties are corporate affiliates of one another, according to their attorney's testimony at trial.

[2] Affirmation does not challenge the summary judgment against it on its claims under the Deceptive Trade Practices-Consumer Protection Act (DTPA) against each of the Windsor Parties nor on its claims for aiding and abetting breach of contract against CWS Apartment Homes and

four appellate issues, the first of which includes several discrete subparts. In its appellate issues it attacks (1) the summary-judgment rulings against it on its contract, fraud, and negligent-misrepresentation claims; (2) exclusions of evidence from the summary-judgment record; (3) the holding of a trial on Windsor's request for attorneys' fees, expenses, and costs; and (4) the proof supporting the award to Windsor of attorneys' fees, expenses, and costs.

Because the summary-judgment record did not raise a genuine issue of material fact on the breach element of the contract claim, or on the claims for fraud and negligent misrepresentation in light of other applicable legal rules, the trial court properly granted summary judgment. And because Windsor's evidence supplied sufficient information for the trial court to reach the award of fees, expenses, and costs, the court did not err in its award. We affirm.

## BACKGROUND

Affirmation and Windsor entered into a Real Estate Acquisition Contract and Escrow Instructions, as amended (the Agreement), under which Windsor would sell to Affirmation certain real property in Austin and its associated improvements, which include an apartment complex (the Property). The parties signed the Agreement in November 2016; its Effective Date was, based on amendments the parties signed, in February 2017; and, also after the contract amendments, the parties closed the transaction on April 3, 2017. Before closing, Affirmation received a December 2016 report from a contractor who had inspected the Property for Affirmation. Afterward, Affirmation received from Windsor a $73,000 reduction in the Agreement's $21.3-million purchase price.

---

CWS Capital Partners. Affirmation had also pleaded claims against Matt Pohl and Forrest Bass, but those claims were dismissed with prejudice by agreed order, and Affirmation does not challenge the dismissal of the claims against Pohl and Bass.

2

Also before the closing, the Property undisputedly suffered from problems with its two fire hydrants. (Otherwise, the parties dispute whether the Property suffered from other defects pre-closing.) Four days before the closing, on March 30, 2017, Windsor's attorney sent Affirmation's representatives an email with attachments disclosing "certain work that was required by the City of Austin at the Property" with the fire hydrants and what work was done, in Windsor's view, to resolve the issues. Affirmation's attorney responded by email thanking the sender for the attachments and for the "confirm[ation] that the work has been completed."

Yet after closing, Affirmation allegedly discovered a host of defects on the Property, including defects with the fire hydrants and their supply lines, substandard overall water temperature and pressure, underground water leaks, and defects with gas lines. Affirmation sued the Windsor Parties, asserting that "multiple and material defects in the Property were known by the Defendants but not disclosed to the Purchaser."

The Windsor Parties answered and later moved for a traditional summary judgment on all Affirmation's claims, attaching evidence. They argued that Affirmation could not recover in contract, focusing on the breach element of the claim, because the sections of the Agreement that Affirmation had pleaded had been breached called for the disclosure of only certain limited information and Windsor either had disclosed that information or had cured any problems or Affirmation knew about the information at issue. The provisions of the Agreement at issue, the Windsor Parties argued, did not require disclosure of all purported defects with the Property but of only more limited information like pending actions affecting the Property or notices of the Property's violations of municipal codes.

The Windsor Parties also argued that Affirmation's claims for common-law fraud, statutory fraud, and negligent misrepresentation were barred by (1) the legal rule that certain tort

3

claims brought by one party to a contract against the other are barred when the nature of the alleged tort injury is only the economic loss to the subject of the contract and (2) the Agreement's "as is" clause, its language concerning Affirmation's right to inspect the Property, and its language disclaiming Affirmation's reliance on certain representations and omissions.

Finally in their motion, the Windsor Parties raised a provision of the Agreement dealing with the monetary relief that may be recovered by one party to the Agreement against the other. They argued that this provision prevented Affirmation from recovering under any of its claims, contractual or not, "damages related to lost profits, benefit of the bargain, or any other type of punitive or consequential damages."

Affirmation responded to the motion for summary judgment, attaching evidence of its own.[3] It argued that the summary-judgment record included evidence raising a genuine issue of material fact to defeat summary judgment on each of its claims against each of the Windsor Parties. The trial court signed an order granting the Windsor Parties' motion for summary judgment and in the same order sustained some and overruled other of the Windsor Parties' objections to Affirmation's summary-judgment evidence. Ultimately, however, the court in the summary-judgment order explained that it would have granted summary judgment for the Windsor Parties even if it had not excluded the summary-judgment evidence that the order excluded. A trial on Windsor's claims under the Agreement for attorneys' fees, expenses, and costs ensued, and the trial court's rulings on those claims led to the final judgment that Affirmation now appeals.

---

[3] The Windsor Parties' first motion for summary judgment was denied. As for the summary-judgment rulings on appeal here, Affirmation's response and supplemental response to the motion for summary judgment that was granted expressly incorporated Affirmation's earlier summary-judgment response and supplemental response. Thus, Affirmation's written response to the second, granted motion for summary judgment consists of four filings and their attachments.

4

**DISCUSSION**

Affirmation's first and second appellate issues concern the summary judgment against it on all its claims. Its third and fourth appellate issues concern the later final trial on attorneys' fees, expenses, and costs.

We review grants of summary judgment *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* We may not reverse a summary judgment without properly assigned error, and when a summary-judgment order does not specify the grounds on which the order's grant of summary judgment is based, the appealing party must negate each ground on which the summary judgment could have been based. *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 226 (Tex. 2022). "Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal" of a summary judgment. Tex. R. Civ. P. 166a(c).

A defendant may move for a summary judgment "in his favor as to all or any part" of a claim asserted against the defendant. Tex. R. Civ. P. 166a(b). To prevail in such a situation, a defendant moving for traditional summary judgment must establish that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Ivy v. Garcia*, No. 03-18-00545-CV, 2019 WL 3756483, at *2 (Tex. App.—Austin Aug. 9, 2019, no pet.) (mem. op.). The defendant must either conclusively negate at least one element of the claim or conclusively establish each element of an affirmative defense to the claim. *Ivy*, 2019 WL 3756483, at *2.

A plaintiff responding to such a motion can defeat the attempt to conclusively negate an element of the plainiff's claim by adducing evidence that raises a genuine issue of material fact. *See Sanchez-Rolon v. Pactiv, LLC*, No. 03-23-00031-CV, 2024 WL 5286331, at *3–4 (Tex. App.—Austin Dec. 31, 2024, no pet.) (mem. op.). A genuine issue of fact exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions on the issue. *See Community Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017); *Sanchez-Rolon*, 2024 WL 5286331, at *3.

### *Exclusions of evidence from the summary-judgment record*

Affirmation in its second appellate issue addresses some of the rulings that excluded certain material from evidence at summary judgment. The Windsor Parties had objected to, generally speaking, two groups of evidence offered by Affirmation—(1) testimony in affidavits or in declarations made under penalty of perjury and (2) documents that had been used as deposition exhibits whose associated depositions Affirmation also offered for the summary-judgment record. On appeal, Affirmation makes no argument for why the items of testimony that were excluded should not have been; it contests only the exclusions of the deposition-exhibit documents. Because Affirmation does not challenge the exclusions of the affidavit and declaration testimony, we will not rely on any of the excluded testimony in our discussion below of the other appellate issues.

The exclusions of the deposition-exhibit documents we must treat differently because of just how voluminous and varied the documents at issue are.[4] Affirmation attached the

---

[4] Attached to the deposition of an employee of CWS Capital Partners were four deposition exhibits totaling 95 pages, all excluded based on the Windsor Parties' objection. Attached to the

documents to their associated depositions and offered both the documents and the depositions en masse for the summary-judgment record.  The Windsor Parties objected to the documents similarly en masse, making three objections to three respective sets of deposition exhibits corresponding to three witnesses' respective depositions.  The Windsor Parties argued that the deposition-exhibit documents were not authenticated and were hearsay, and the trial court sustained these objections without stating its basis for doing so.

On appeal, Affirmation argues that the excluded documents were authenticated by certain declaration testimony in the summary-judgment record, but in response to the hearsay objections, Affirmation argues simply that none of the documents were offered for their truth but were offered only to show their existence and thus to show matters like notice or knowledge.

Because applying the parties' competing blanket arguments to each document at issue is unnecessary and would be unduly cumbersome, we need not reach the entirety of this appellate issue.  *See* Tex. R. App. P. 47.1.  Instead, we will address any relevant excluded deposition-exhibit documents below in our analysis of the rest of the appellate issues where the document might be relevant.  As will be shown below, notwithstanding Affirmation's arguments on appeal for why the documents should not have been excluded, summary judgment for the Windsor Parties was still proper.

---

deposition of a principal with Affirmation's inspection contractor were six deposition exhibits totaling 20 pages, again all excluded.  And attached to the deposition of Affirmation's expert witness were 11 deposition exhibits totaling 53 pages, again all excluded.

***Summary judgment on Affirmation's claims for breach of contract, common-law fraud, statutory fraud, and negligent misrepresentation***

Affirmation in its first appellate issue, with its discrete subparts, attacks the summary judgment on all its claims in the suit, specifically, the contract claim against Windsor alone and the claims against each of the three Windsor Parties for common-law fraud, statutory fraud, and negligent misrepresentation. Under all its claims, Affirmation alleges liability arising out of certain nondisclosures—that Affirmation was not informed by the Windsor Parties about certain matters relating to the Property and that the nondisclosures of those matters caused Affirmation damages.

The nondisclosures alleged can be divided into two categories: (1) nondisclosures of matters made the subject of express representations and warranties contained in the Agreement and (2) all other alleged nondisclosures. For the first category, Affirmation alleges that those nondisclosures both constitute breaches of the Agreement under Affirmation's contract claim and form the bases for its claims of common-law fraud, statutory fraud, and negligent misrepresentation. The second category of nondisclosures also allegedly form the bases for Affirmation's claims of common-law fraud, statutory fraud, and negligent misrepresentation.

*Breach of contract*

Affirmation pleaded, and both argued in the trial court and argues on appeal, that the contract-based nondisclosures violate two provisions of the Agreement. Both are from the Agreement's Section 6(a), the section listing seven sets of "representations and warranties" being made by Windsor to Affirmation. The first is Subsection (ii), under which Windsor represented and warranted that "[a]s of the Effective Date, there is no action or proceeding pending or, to Seller's knowledge, threatened in writing against the Property, including condemnation

8

proceedings, or against Seller which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement," with exceptions not relevant here. (The Effective Date was in February 2017.) Under this provision, Affirmation did not present any evidence of any relevant pending action or proceeding, so its allegations under this provision depend on the provision's alternative condition that—"to Seller's knowledge"—there are no threatened proceedings.

The second provision at issue is Subsection (vii). Under it, Windsor represented and warranted,

> To Seller's knowledge, except as disclosed in the documents and other information provided or made available to Buyer, Seller has no knowledge, and Seller has not received any written notice from any governmental entity (A) of any material violation by Seller of any law, rule or regulation affecting the Property or its use including any environmental law or regulation, or (B) that the Property is in material violation of any applicable building or zoning code or ordinance, except in each case for any such matters which may have been previously cured.

Affirmation's allegations under this provision, like its allegations under Subsection (ii), turn on the concept of the Seller's knowledge. The Agreement defined that term "and similar terms," limiting them "to the current actual knowledge of Michael Brittingham (the 'Seller Knowledge Party')" and prohibiting "[t]he knowledge of others" from being "imputed to the Seller Knowledge Party." Brittingham is the Principal-Director of Acquisitions of CWS Capital Partners.

Assessing arguments under the breach element of a contract claim involves confronting both questions of law and questions of fact. "The conduct required by the parties under a contract is a question of law." *Trinity Materials, Inc. v. Sansom*, No. 03-11-00483-CV, 2014 WL 7464023, at \*10 (Tex. App.—Austin Dec. 31, 2014, pet. denied) (mem. op.). But "[a]ny dispute concerning the failure of a party to comply with the contract is a fact question for the jury." *Id.* "Stated another way, the 'judge determines what conduct is required of the

parties and, insofar as a dispute exists concerning the failure of a party to perform the contract, the judge submits the disputed fact questions to the jury.'" *Id.* (quoting *Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 186 (Tex. App.—Austin 1998, pet. denied)).

Affirmation's first argument that there was a genuine issue of material fact on the breach element of its contract claim relies on both the affidavit testimony and the statements in a declaration made under penalty of perjury of Affirmation's manager. Yet nothing in either the affidavit or the declaration is any evidence of what Brittingham knew about the nondisclosures that the affidavit and declaration complain of. Although they discuss many purported nondisclosures by the Windsor Parties, the affidavit and declaration say nothing about what Brittingham knew and offer no evidence from which a reasonable inference could be drawn that Brittingham knew of any of what the affidavit and declaration otherwise discuss. Therefore, Affirmation's manager's affidavit and declaration do not raise any genuine issue of material fact under the breach element of Affirmation's contract claim.

Affirmation's remaining arguments under the breach element point to several specific purported nondisclosures, but in each instance the evidence does not overcome the Agreement's language defining Subsections (ii) and (vii)'s scope, defining Seller's knowledge, and providing a safe harbor for Windsor when certain matters have been cured. The first of these is Affirmation's argument from a letter sent by an attorney for one of the Property's tenants. The letter itself was excluded from the summary-judgment record, but even if it had not been, it raises no genuine issue of material fact of a breach of Subsections (ii) or (vii). It is no evidence of whether Brittingham knew about the letter's contents—for example, it is not addressed to him.[5]

---

[5] Moreover, the letter is no evidence under Subsection (ii) of any threatened action or proceeding as of the February 2017 Effective Date because the letter was sent in May 2017.

10

The next argument relies on several instances over several years of the two fire hydrants on the Property failing City fire-department inspections. Even if the notices of failed inspections were not disclosed to Affirmation, they raise no genuine issue of material fact on breach under either of the Subsections at issue. Under Subsection (ii), the notices of failed inspections are not themselves "action[s] or proceeding[s] pending or . . . threatened in writing," and there is no indication in the record—and Affirmation makes no such argument on appeal— that a fire hydrant that once failed one of these City inspections "challenges or impairs Seller's ability to execute or perform its obligations under th[e] Agreement." Then under Subsection (vii), Windsor does not breach when the matter at issue is one "which may have been previously cured," and in this instance, the Windsor Parties supplied summary-judgment evidence conclusively proving that the matter of the failed City hydrant inspections had been cured. They attached to their motion for summary judgment the email by which Windsor representatives transmitted to Affirmation's manager attachments showing that work by a contractor had been performed and that the two hydrants now passed the City inspections at issue. This email was sent four days before closing.

Affirmation takes issue with this evidence in that it argues that the hydrant-inspection problems actually were not cured because on the day of closing, Windsor's plumbing contractor sent an email to certain Windsor Parties representatives saying that the City fire department retested the hydrostatic pressure on the fire line and concluded that the entire system failed and that the fire department's testing also indicated the presence of at least one, and

11

possibly several, leaks on the fire-hydrant line.[6]  This evidence, in our view, does not concern the reasons that the fire hydrants had failed prior inspections—just four days before closing and this email, the hydrants at that point passed those same inspections.  Instead, this email points to other potential problems with the Property's fire-hydrant system more broadly, but, crucially, there is no summary-judgment evidence showing that Brittingham had knowledge of these other potential problems with the system.  Therefore, the past failed inspections and the day-of-closing email do not raise any genuine issue of material fact of breach of Subsections (ii) or (vii).

Finally under the purported Agreement-based nondisclosures, Affirmation argues from post-closing notices from the City, that "[o]n April 19, 2017, . . . the City of Austin issued a Notice of Violation to Purchaser that the Property's water heater facilities were in violation of City Code requirements" and "a Violation Report, finding that the lack of hot water constitutes a violation of the Austin City Code."  Because these notices were issued post-closing of the Agreement's transaction, they raise no genuine issue of material fact that Windsor breached Subsections (ii) or (vii).

In all, under one or more of the portions of the Agreement's language applicable here, the summary-judgment record failed to raise a genuine issue of material fact that Windsor breached either Subsection (ii) or Subsection (vii).[7]  The trial court thus did not err by granting

---

[6]  The email itself was excluded from the summary-judgment record based on the Windsor Parties' hearsay and authentication objections.  Affirmation's only responsive argument on appeal to the hearsay objection is that this email (and documentary evidence) was not being offered for its truth.  Yet for Affirmation's arguments from this email to be successful, the statements in the email indicating that the fire department believed that the entire fire-hydrant system was failing need have been offered for their truth.

[7]  Also in the portion of its appellate brief addressing breach of contract, Affirmation adds arguments about the purported representation in the day-of-closing email "that all required work had been completed" and purported nondisclosures of water-temperature and -pressure issues on

Windsor summary judgment on the contract claim against it. We overrule the relevant portion of Affirmation's first appellate issue.

*Common-law fraud, statutory fraud, and negligent misrepresentation*

In a different discrete subpart of its first appellate issue, Affirmation contends that the trial court erred by granting summary judgment on its claims for common-law fraud, statutory fraud,[8] and negligent misrepresentation. Affirmation pleaded these three claims against all three of the Windsor Parties.

As the bases for these claims, Affirmation pleaded both the contractual nondisclosures under Subsections (ii) and (vii), addressed above, and nondisclosures about matters that are not the subject of any provision of the Agreement. In this latter category, Affirmation pleaded, and argues on appeal, that the Windsor Parties failed to disclose that:

(1) water being supplied to apartment units was of such a grossly insufficient temperature that it did not comply with local and state housing codes and triggered numerous tenant complaints and departures;

(2) water pressure being supplied to apartment units was grossly inadequate, making simple tasks such as showering, washing clothes and cleaning dishes difficult, if not impossible;

(3) fire hydrant static pressure was too low to comply with city codes, exposing the Property and its tenants to potential harm in the event of a fire;

---

the Property. But we do not see the connection, and Affirmation has not shown any connection, between these alleged nondisclosures and the plain language of Subsections (ii) and (vii). Though these nondisclosures may or may not be actionable as bases for fraud or negligent misrepresentation, they are not examples of any breach of Subsections (ii) or (vii).

[8] *See generally* Tex. Bus. & Com. Code § 27.01. Among its fraud claims, Affirmation also alleged fraudulent inducement. Fraudulent inducement is a special form of alleged fraud under which the defendant is alleged to have induced the plaintiff to enter into a contract through the use of fraudulent misrepresentations. *See Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998).

(4) fire hydrant flow was insufficient, further increasing the risk that a sizeable fire could not be put out quickly and safely;

(5) gas lines crossing the Property are improperly utilizing PVC piping; and

(6) the presence of significant underground leaks whereby millions of gallons of water have been lost over time.

(Formatting altered.)

Because we have concluded that under Subsections (ii) and (vii), there is no genuine issue of material fact of any violation by Windsor of those provisions, those alleged nondisclosures cannot form the basis of any of the fraud or negligent-misrepresentation claims against Windsor. Moreover, because only Windsor, and not also CWS Apartment Homes and CWS Capital Partners, was party to the Agreement with Affirmation, the alleged contractual nondisclosures cannot form the basis for any fraud or negligent-misrepresentation claims against CWS Apartment Homes and CWS Capital Partners. We are thus left with only purported extra-contractual nondisclosures as the bases for Affirmation's remaining claims.

As to the negligent-misrepresentation claim, one of the Windsor Parties' grounds for summary judgment was the legal rule that certain tort claims brought by one party to a contract against the other are barred when the nature of the alleged tort injury is only the economic loss to the subject of the contract. Affirmation for its negligent-misrepresentation claim alleges only injuries arising from the Property's falling below the standard that Affirmation thought it was getting under the Agreement. Therefore, Affirmation may not recover on the negligence-based claim—the claim sounds instead only in contract. *See D.S.A., Inc. v. Hillsboro ISD*, 973 S.W.2d 662, 663–64 (Tex. 1998) (per curiam); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). The trial court thus did not err by granting the Windsor Parties judgment as a matter of law

14

on the negligent-misrepresentation claim. However, because Affirmation for its fraud claims alleges fraudulent inducement to enter into the Agreement, this legal rule does not of its own force entitle the Windsor Parties to judgment as a matter of law on the fraud claims. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *see also Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001) (explaining *Formosa Plastics*).

As to the fraud claims, another of the Windsor Parties' grounds for summary judgment relied on the Agreement's "as is," inspection–disclaimer, and disclaimer-of-reliance language. The Windsor Parties point to the following language in the Agreement's Section 6(e):

> Buyer acknowledges that it is knowledgeable and experienced about properties similar to the Property and that, except for Seller's express representations and warranties set forth herein, it is relying entirely on its own experience, expertise, inspection and study regarding the condition (including title, physical and environmental) and prospects for development of the Property. Buyer agrees that it is purchasing and accepting the Property "**AS IS**" and, subject to all faults of every kind and nature whatsoever, whether latent or patent, whether now or hereafter existing, and Buyer has based its purchase decision solely upon Buyer's inspection of the Property. . . . Seller makes no representations or warranties in this transaction, except as expressly set forth in this Agreement. Except for Seller's express representations and warranties set forth herein, Buyer further agrees that Buyer has not relied, and will not rely, upon any other representation or statement, or the failure to make any representation or statement, by Seller or Seller's agents or employees or by any person acting, or purporting to act, on behalf of Seller.

Contractual clauses like these interact in different ways with a real-estate-buying plaintiff's allegations of fraud and the plaintiff's allegations of fraudulent inducement. For example, such a plaintiff's fraud claims include an element of causation or reliance, but in general, those elements can be negated by a contractual "as is" clause about the subject of the parties' contract or by a clause disclaiming reliance on the condition of the property in favor of the plaintiff's own inspection of the property, defeating the claims as a matter of law. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995); *Ivy*, 2019 WL 3756483, at *2–3.

15

However, a plaintiff who pleads and proves fraudulent inducement can often save fraud claims from an "as is" clause or an inspection–disclaimer clause. Specifically, because of the general rule that a party is not bound to a contract fraudulently procured, a genuine issue of material fact about the real-estate-buying plaintiff's allegation of fraudulent inducement can defeat summary judgment in the defendant's favor based on its assertion of "as is" and inspection–disclaimer clauses like those here. *See Prudential Ins.*, 896 S.W.2d at 162; *Ivy*, 2019 WL 3756483, at \*2–3.

But still further, the plaintiff's allegations of fraudulent inducement can themselves be defeated by an applicable contractual disclaimer-of-reliance clause. If the parties' contract also includes a disclaimer-of-reliance clause—a clause that "clearly and unequivocally expresses the party's intent to disclaim reliance on the specific misrepresentations at issue"—then such a clause can sever the causal chain of the allegation of fraudulent inducement, meaning that fraudulent inducement can no longer save the plaintiff's fraud claims. *See International Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 229 (Tex. 2019); *see also Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 232 (Tex. 2019) ("[I]n certain circumstances a contract's terms may preclude a claim for fraudulent inducement with 'a clear and specific disclaimer-of-reliance clause.'" (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332 (Tex. 2011))); *Pogue v. Williamson*, 605 S.W.3d 656, 666 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[S]imilar to how demonstrating fraudulent inducement can, as a matter of law, preclude a contract's 'as-is' clause, proof of an enforceable disclaimer-of-reliance clause can, as a matter of law, preclude a fraudulent-inducement claim.").

Here, there is no genuine issue of material fact supporting any actionable nondisclosure under the Agreement; Affirmation must rely instead on extra-contractual

nondisclosures. But the Agreement's disclaimer-of-reliance clause—because it disclaims Affirmation's reliance on any and all extra-contractual "representation[s] or statement[s], or the failure to make any representation or statement, by Seller or Seller's agents or employees or any person acting or purporting to act, on behalf of Seller"—means that any causal chain for fraud, including fraudulent inducement, is severed when the fraud claim relies on an extra-contractual nondisclosure. *See Bombardier Aerospace*, 572 S.W.3d at 232; *International Bus. Machs.*, 573 S.W.3d at 229. That is the case here for Affirmation's reliance on purported extra-contractual nondisclosures.

Affirmation's arguments on appeal do not challenge whether the disclaimer-of-reliance clause is binding on it. Instead, it contests whether the clause can reach nondisclosures under Subsections (ii) and (vii) because of how Section 6(e) restricts itself from reaching the express representations and warranties otherwise stated in the Agreement. But as we have said, there is no genuine issue of material fact that any of the Windsor Parties made any nondisclosure under those Subsections, so Affirmation's arguments on appeal are unavailing.

Thus, the trial court did not err by granting the Windsor Parties' summary judgment on the claims for common-law fraud, statutory fraud, and negligent misrepresentation. We thus overrule the rest of Affirmation's first appellate issue.

### Attorneys' fees, expenses, and costs

Affirmation's remaining two appellate issues, its third and fourth, concern the trial court's awards of attorneys' fees, expenses, and costs to Windsor. The third issue depends on reversal of the summary judgment under the first issue:

> With respect to the trial on attorneys' fees and expenses, no trial should have ever occurred. Indeed, because the summary judgment was improvidently granted, this

17

Court must reverse and remand for trial, and that remand would not only include the affirmative claim of the Appellant/Plaintiff, but also the fee claim of the Appellee/Windsor.

Because we overrule Affirmation's first issue and affirm the summary judgment, we overrule this third issue as well.

In its fourth issue, Affirmation offers four discrete arguments for reversing the award to Windsor of $192,009.25 in attorneys' fees[9] and $18,352.34 in costs and expenses. The first argument is that because portions of Windsor's fee-invoice exhibits included redactions and "the witness attempting to prove up those invoices did not have personal knowledge of the contents of the billing descriptions that had been redacted," the exhibits were "not competent proof for the witness to opine on the reasonableness of the redacted fees." The party seeking an award of attorneys' fees must prove the reasonableness and necessity of the requested fees. *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 484 (Tex. 2019); *Person v. MC-Simpsonville, SC-1-UT, LLC*, No. 03-20-00560-CV, 2021 WL 3816332, at *5 (Tex. App.— Austin Aug. 27, 2021, no pet.) (mem. op.). Both reasonableness and necessity are questions of fact to be determined by the factfinder. *Rohrmoos*, 578 S.W.3d at 489; *Person*, 2021 WL 3816332, at *5. The fee claimant must put forward evidence of itemized specific tasks and the time required for those tasks. *See Rohrmoos*, 578 S.W.3d at 495 (discussing *City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) (per curiam)).

Despite the redactions shown on some of the invoices, Windsor's fees evidence sufficed to support the proof necessary of itemized specific tasks and the time required for them. Windsor's evidence included not only the exhibits of fee invoices but also the expert testimony of

---

[9] Windsor had requested $395,343.93 in attorneys' fees.

its lead counsel in the suit. She testified that she "reviewed each and every time entry in preparing for" her expert testimony on fees and "also lived it." She added that because she was lead counsel for Windsor in the suit, she was "fully aware of everything that happened on the case." And she said that to prepare her expert opinions, she "re-review[ed] . . . the pleadings, the motions, the answers, responses, written discovery, [and] depositions" in the suit. When questioned on cross-examination about what the trial court could glean from fee invoices that contained redactions, Windsor's lead counsel testified that her testimony was what would supply the court with evidence about whether the specific time entries, some of whose descriptions were redacted, were both reasonable and necessary. And in response to a similar cross-examination question about a different redacted time entry, Windsor's lead counsel testified that Windsor had discounted the total fees billed by its attorneys in the suit by at least five percent[10] to account for redacted time entries where the lead counsel was not aware of the nature of the underlying task. The lead counsel's testimony, therefore, supplies information on which the trial court could exercise its discretion to decide that the fees requested were proved by evidence of itemized specific tasks and the time required for those tasks. *See Person*, 2021 WL 3816332, at *8 (stating that for review of fee requests, "the operative question is whether the trial court had sufficient evidence to exercise its discretion, not whether the billing records were or were not redacted" (quoting *Fiamma Statler, LP v. Challis*, No. 02-18-00374-CV, 2020 WL 6334470, at *16 n.21 (Tex. App.—Fort Worth Oct. 29, 2020, pet. denied) (mem. op.))).

Affirmation's second argument stems from language in the Agreement conditioning recovery of attorneys' fees on whether the fees were "incurred." The argument is

---

[10] Beyond the five-percent reduction, Windsor's lead counsel explained that Windsor's fee request did not encompass any work at all performed by one of its attorneys.

that because the fee invoices are addressed to CWS affiliates other than Windsor itself, Windsor cannot meet this "incurred" requirement. For these purposes, a fee is incurred when one becomes liable for it. *See Rohrmoos*, 578 S.W.3d at 489. Windsor's lead counsel's testimony supplied evidence showing that Windsor was liable for the amounts reflected in the fee invoices— she testified expressly that her testimony concerned fees that Windsor had "incurred" in the suit and otherwise testified that 95% of all the work on the suit that had been performed by the Windsor Parties' attorneys was attributable to work on Windsor's behalf analyzing, applying, and advancing arguments based on the Agreement to defeat not only Affirmation's contract claim but also its non-contract claims. We thus conclude that there was evidence on which the trial court could exercise its discretion to decide that Windsor had incurred the fees being requested.

Affirmation's third and fourth arguments address fee segregation. It argues that Windsor did not segregate its fee requests between work on the contract claim and work on the other claims against it and on its counterclaim against Affirmation. And it argues that Windsor also did not segregate between fees incurred by Windsor as against those incurred by either CWS Apartment Homes or CWS Capital Partners, in light of the allegation in Windsor's counterclaim that "Windsor (and the other CWS Defendants) [had] incur[red] significant attorney's fees to date defending the action" filed by Affirmation against them.

The Agreement's fee-shifting provision awards fees to the "successful party" in "any litigation between the parties hereto with respect to any rights or obligations hereunder." As Windsor's lead counsel explained in her testimony, out of all the work performed by the Windsor Parties' attorneys in the suit, 95% of the work concerned Windsor and the Agreement and thus the rights or obligations thereunder. She explained that although "there were other claims" besides breach of contract, "all of the claims center around this contract"—"[e]very single claim, whether

20

there was fraud in the inducement about inducing someone to enter the contract, whether somebody said something, it all related to this purchase and sale." And our analysis above bears out Windsor's counsel's testimony—even the non-contract claims involved to a great degree analysis of the Agreement because it is the Agreement's Section 6(e) language, particularly disclaimer of reliance, that leads to the disposition of the suit's fraud claims. The Windsor Parties had moved for summary judgment using the same Section 6(e) grounds on the negligent-misrepresentation claim as well. Because of this point made by Windsor's counsel in her testimony—the attorneys' analysis and work on applying the Agreement applies not only to the contract claim against Windsor but also to the claims involving CWS Apartment Homes and CWS Capital Partners as well as to the non-contract claims against all Windsor Parties[11]— counsel's testimony supplied evidence to support a determination by the trial court that Windsor need not have segregated within its fee request. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006) (holding that when discrete legal services "advance both a recoverable and unrecoverable claim" they are "so intertwined that they need not be segregated"); *accord Quantum Plus, LLC v. Hospital Internists of Austin, P.A.*, No. 03-23-00263-CV, 2025 WL 420213, at *12 (Tex. App.—Austin Feb. 7, 2025, no pet. h.) (mem. op.). We thus overrule Affirmation's final appellate issue.

---

[11] And also to the counterclaim because it was based, Windsor's lead counsel testified, on an alleged breach by Affirmation of one of the Agreement's express representations and warranties.

21

**CONCLUSION**

We affirm the trial court's final judgment.

_____
Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed:   May 30, 2025